# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN "JAY" WEISS, Ph.D., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | **CONSOLIDATED** |
| | ) | |
| v. | ) | **NO. 3:06-0950** |
| | ) | **JUDGE ECHOLS** |
| LABORATORY CORPORATION OF | ) | |
| AMERICA HOLDINGS, ET AL., | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

_____

| | | |
|---|---|---|
| GARY KITOS, Ph.D., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | **NO. 3:06-1010** |
| | ) | **JUDGE ECHOLS** |
| LABORATORY CORPORATION OF | ) | |
| AMERICA HOLDINGS, ET AL., | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

## MEMORANDUM

Before the Court are motions for summary judgment filed by Defendants Laboratory Corporation of America Holdings ("LabCorp") and Esoterix, Inc. ("Esoterix") as to both Plaintiffs (Docket Entry Nos. 49 & 56), and  cross-motions for summary judgment filed by Plaintiff John "Jay" Weiss, Ph.D. ("Dr. Weiss") and Plaintiff Gary Kitos, Ph.D. ("Dr. Kitos") (Docket Entry Nos. 52 & 59).  The parties fully briefed these motions.  Also before the Court are Plaintiffs' motions to dismiss Defendants' counterclaims (Docket Entry Nos. 28 & 30).  Because the Court considers the viability of Defendants' counterclaims in conjunction with the motions for summary judgment, Plaintiffs' motions to dismiss will be denied as moot.  The Court has also considered Defendants'

1

Supplemental Brief with attached documents (Docket Entry No. 77) and Plaintiffs' Supplemental Brief and the affidavit of John "Jay" Weiss, Ph.D. (Docket Entry Nos. 80 & 81.)

# I. <u>FACTS</u>

Esoterix is a clinical laboratory testing company headquartered in Austin, Texas. Esoterix operated an allergy testing laboratory at its facility in Brentwood, Tennessee. In 1996 Dr. Kitos sold his own allergy testing laboratory to Esoterix and thereafter served as Executive Director of Esoterix's laboratory in Brentwood. Dr. Kitos had two different employment contracts with Esoterix, the second of which expired at the end of 2002. Esoterix recruited Dr. Weiss in 2000. He served as Director of Immunoassay Development.

LabCorp is headquartered in Burlington, North Carolina and provides clinical laboratory services throughout the United States. In the spring of 2005, LabCorp acquired Esoterix, which became a wholly-owned subsidiary of LabCorp. In an effort to maintain continuity at Esoterix, LabCorp and Esoterix decided to extend offers of continued employment for one year after the acquisition date to certain key employees of Esoterix. On April 18, 2005, Dr. Kitos and Dr. Weiss each received a written offer of continued employment with Esoterix. The letters were written on Esoterix letterhead, were identical except for the differences in title, salary, and bonuses, and were signed by James A. McClintic, President and CEO of Esoterix. Dr. Kitos' letter offered to maintain him in the position of Executive Director and pay him a base salary of $152,954.94 plus a target bonus of $22,882.24. Dr. Weiss' letter offered to maintain him as Director of Immunoassay Development and pay him a base salary of $132,683.20 plus a target bonus of $19,902.48. Esoterix had previously paid certain employees a "target bonus," a form of profit-sharing if certain

2

pre-determined performance and financial goals of the company were met in the applicable calendar year.

The offers of continued employment also included the following provisions:

Terms and Conditions. You shall be subject to and shall comply with all Company policies and procedures as they may be amended and/or supplemented from time to time.

At-Will Employment. Your employment will be at-will, meaning that either you or the Company may terminate the employment at any time for any reason with or without notice.

Severance. If the Company terminates your employment without Cause at any time before the first anniversary of the Closing Date, the Company shall provide you the following severance benefits (the "Severance Payment"): six months' base salary and six months' targeted bonus. Of course, any Severance Payment, like any other salary and bonus payments to you, shall be less standard deductions and withholdings for federal, state, and local taxes as determined by the Company. This possible Severance Payment shall be in addition to any change of control payment and any other severance, if any, to which you are entitled pursuant to any plan or agreement with the Company. For the purposes of this paragraph, "Cause" shall mean misconduct by you, any breach by you of any agreement between you and the Company and/or LabCorp, any violation by you of the Company's or LabCorp's policies, any conviction of or pleading guilty to a felony, and any other act or omission by you deemed to be cause by applicable state law. Your receipt of the Severance Payment shall be contingent upon your execution of a general release and waiver of claims against the Company and/or LabCorp. You shall not be entitled to the Severance Payment described in this Paragraph if your employment ends after the first anniversary of the Closing (regardless of the reason); or for any reason other than the Company's terminating you without Cause.

Retention Bonus. In the event that you are still employed by the Company through and including the first anniversary of the Closing, the Company shall pay you a Retention Bonus in an amount equal to twenty percent (20%) of the annualized base salary rate and target bonus identified above. Any such payment shall be due to you no later than sixty days after the first anniversary of the Closing, and shall be less standard deductions and withholdings for federal, state, and local taxes as determined by the Company. If your employment ends prior to the first anniversary of the Closing for any reason, you shall not receive the Retention Bonus.

Pre-Conditions. This offer of continued employment on these terms, and in particular your eligibility for a Severance Payment and a Retention Bonus, is

3

expressly contingent on the following: (1) the consummation of the acquisition of the Company by LabCorp and the Closing's occurring on or before August 1, 2005 and (2) your complying with all LabCorp policies and related agreements.

  <u>Other Agreements.</u>  Unless expressly provided herein, nothing in this Agreement is intended to supercede any agreement(s) between you and the Company, including any agreement relating to confidentiality, proprietary information and/or inventions.  Such agreements, which include those in the prior paragraph, shall remain in full force and effect according to their terms.

  <u>Governing Law.</u>  This Agreement shall be governed by the laws of North Carolina, not including its choice of law rules.

(Docket Entry Nos. 53-2; 60-4.) Dr. Kitos signed his letter on April 22, 2005. Dr. Weiss signed his letter on April 21, 2005.

  The letters did not specifically state that Dr. Kitos and Dr. Weiss must sign a non-solicitation/confidentiality agreement as a condition of employment at LabCorp or as a condition to receipt of a severance payment or target bonus.  Additionally, a refusal to sign a non-solicitation/confidentiality agreement was not specifically enumerated under the definition of "Cause" in the "Severance" paragraph.

  When Dr. Kitos and Dr. Weiss signed the letters, they did not have access to LabCorp's policies and procedures manual.  No one from Esoterix or LabCorp expressly informed Dr. Kitos and Dr. Weiss that LabCorp would require them to sign non-solicitation/confidentiality agreements as a condition of their continued employment.

  At the time the letters were signed, Dr. Weiss did not have a signed non-solicitation/confidentiality agreement with Esoterix.  (Weiss Depo. at 51.)  The record does not reveal whether Dr. Kitos had a signed non-solicitation/confidentiality agreement with Esoterix. LabCorp's acquisition of Esoterix closed on May 11, 2005.

Dr. Kitos and Dr. Weiss first obtained access to LabCorp's policies and procedures manual by intranet in September 2005, and they reviewed LabCorp's policies at that time.[1] LabCorp had a policy on Confidentiality & Security, Policy Number 2-202, effective January 1, 2004. (Docket Entry No. 53-9.) This policy provided in part:

**Confidential and Proprietary Information**

Information is one of LabCorp's most valuable assets, and each employee has a continuing obligation to maintain the confidentiality of Company information and documents. Therefore, an employee may not (either during or after employment) give or release confidential or proprietary Company information to anyone not employed by LabCorp including, but not limited to, competitors, suppliers and outside contractors. Employees who improperly use or disclose official or confidential business information will be subject to disciplinary action, up to and including termination. This information is confidential, proprietary and of great value to LabCorp, and, upon termination of employment, employees shall return all such information, including all copies in electronic, paper or other forms to LabCorp.

<u>Because of the great value of such information and to assure its confidentiality, the Company requires that all employees sign confidentiality and non-solicitation agreements, which they must observe.</u> All employees are required to observe and protect the confidentiality of proprietary and trade secret information. Employees found to be in violation of the above policies will be subject to corrective action.

(Docket Entry No. 53-9 (emphasis added).)

Before LabCorp acquired Esoterix, in November 2004, Dr. Kitos and Dr. Weiss discussed opening their own allergy testing laboratory. Following LabCorp's acquisition, Esoterix was in some turmoil during the remaining months of 2005 and early 2006. Dr. Kitos and Dr. Weiss decided that they would fulfill their letter agreements to work for one year following LabCorp's acquisition of Esoterix until May 11, 2006, and then they would likely resign their employment and

---

[1]Tammy Owens, LabCorp's Director of Human Resources for Esoterix facilities, testified that she and other LabCorp employees, including Dr. Kitos and Dr. Weiss, did not obtain access to LabCorp policies and procedures until December 2005 or January 2006. (Owens Depo. at 15-17, 19.)

5

open their own allergy testing laboratory in Tennessee in competition with LabCorp and Esoterix. In late 2005 and early 2006 they took preparatory steps to open their own laboratory, such as writing a business plan, choosing a name for the laboratory ("Allermetrix Inc."), discussing how the business would be run and who the customers would be, meeting with bankers, obtaining a mortgage, and purchasing a building. Another Esoterix employee, Cecilio "J.R." Olavarria, wanted to work for Dr. Kitos and Dr. Weiss if they opened their own laboratory. Dr. Weiss used his company computer to send or receive four emails, two of which were sent to Dr. Kitos, concerning the new laboratory startup. Dr. Weiss also used his company computer to purchase the design of a corporate logo for Allermetrix over the internet.

In January 2006, Esoterix HR Director Tammy Owens held a company meeting with Esoterix employees. Dr. Kitos and Dr. Weiss attended the meeting. Near the conclusion of the meeting, Ms. Owens announced that standard LabCorp policy required all employees, including Esoterix employees, to sign non-solicitation/confidentiality agreements. (Docket Entry No. 49-8.) The agreement prohibits employees from making unauthorized disclosures of LabCorp's confidential and proprietary information and from soliciting LabCorp customers or employees for a period of one (1) year following termination of employment. Employees were directed to pick up copies of the agreement and sign them.

Dr. Kitos and Dr. Weiss did not want to sign the agreement because they viewed it as a non-competition agreement. Dr. Kitos "was very concerned about it when [he] saw it[,]" and thought it would prohibit him from opening Allermetrix at all. (Kitos Depo. at 63, 199.) Dr. Weiss testified: "If I were to be terminated by LabCorp for any reason, for 12 months, if I wanted to do allergy testing, I would be excluded from using any–trying to get any LabCorp customers through any

6

means, direct knowledge, indirect knowledge, or solicit any of their employees directly or indirectly, and there's no compensation for that." (Weiss Depo. at 56-57.) Dr. Weiss was also concerned that LabCorp's market share of the allergy business is large and it is almost impossible to compete without running into LabCorp customers. (Id. at 57.) According to LabCorp's website, it tests more than 370,000 specimens daily for 220,000 clients nationwide. The number of LabCorp customers for allergy testing serviced by the Brentwood facility is in the hundreds. The number of LabCorp customers for allergy testing serviced by facilities other than Brentwood is in the thousands.

Dr. Weiss and Dr. Kitos were two of four Esoterix employees, out of approximately 800 employees at Esoterix's Brentwood location, who did not sign the agreement. The record indicates that certain discussions took place between January and March 2006 concerning whether Dr. Kitos and Dr. Weiss would be required to sign the non-solicitation/confidentiality agreements, although the nature of such conversations and those persons involved in such conversations are not entirely clear. The record does show that Dr. Weiss met with Ms. Owens for lunch several times and asked if "the HR policy for this is still up in the air." (Docket Entry No. 53-1, Weiss Depo. at 49.) Dr. Weiss testified that, "it was clear from my talking with her that the HR people that included both LabCorp and what used to be Esoterix people had some differences of opinion about whether this noncompete agreement was changing rules in midstream for the people who had this continuation of employment agreement. . . . . If they were going to give this to us, they should have given it to us at the same time they were giving us the stay-on bonus or the stay-on agreement." (Id. at 49-50.) Dr. Kitos also met with Ms. Owens to discuss the non-solicitation/confidentiality agreement. (Kitos Depo. at 64.)

Owens contacted human resources personnel at LabCorp to determine how to handle Esoterix employees who refused to follow LabCorp's policy requiring employees to sign the non-solicitation/confidentiality agreement. She did not disclose any particular employees by name, but she asked about the policy in general. She did not ask about employees like Dr. Kitos and Dr. Weiss who had signed offers of continued employment. (Owens Depo. at 46.) LabCorp's Director of Human Resources, Khuan Ng, confirmed Owens' understanding that signing the non-solicitation/confidentiality agreement was a condition of employment and that failure to sign the agreement would result in termination of employment. To be certain about the policy, Ms. Ng discussed the matter with Esoterix's CEO, David King, who also confirmed that failure to follow the policy would result in termination of employment. According to Owens, she and Ms. Ng did not discuss requiring Dr. Kitos and Dr. Weiss to sign the non-solicitation/confidentiality agreement before any bonuses would be paid to them.

Owens then "delivered the message" to Dr. Kitos' supervisor, William Tilton, and Dr. Weiss' supervisor, Dr. Greg Stelzer. (Owens Depo. at 55.) Owens informed Tilton and Dr. Stelzer that Dr. Kitos and Dr. Weiss had not signed the non-solicitation/confidentiality agreement, that LabCorp took the document very seriously in all of their acquisitions, and that failure to sign the agreement was grounds for termination. Owens explained that Dr. Kitos and Dr. Weiss needed to understand that their employment would be terminated if they did not sign the non-solicitation/confidentiality agreement. Dr. Stelzer recalls Owens also told him that Dr. Weiss would forfeit his retention bonus if he did not sign the agreement. (Stelzer Depo. at 22-23.)

Dr. Stelzer was also aware that, although Esoterix had not met any of its 2005 performance targets due to the LabCorp acquisition and turmoil in the marketplace, Esoterix management was

8

making some headway in convincing LabCorp that it should pay eligible Esoterix employees at least a portion of the 2005 target bonuses. According to Dr. Stelzer, he knew there was not complete certainty the target bonuses would be paid and he did not know when they would be paid. Dr. Weiss was due to receive at least some portion of his $19,902.48 target bonus for 2005.[2] Dr. Stelzer did not know whether LabCorp withheld the 2005 target bonuses as leverage to get Dr. Weiss and Dr. Kitos to sign the non-solicitation/confidentiality agreement. (Id. at 23-24, 35.)

In February and March 2006 Tilton and Dr. Kitos met more than once to discuss the non-solicitation/confidentiality agreement. (Tilton Depo. at 42.) Tilton informed Dr. Kitos that signing the non-solicitation/confidentiality agreement was a requirement of continued employment at LabCorp. (Kitos Depo. at 103-104.) Tilton explained that the agreement said LabCorp employees could not solicit LabCorp customers or employees. Dr. Kitos knew "who all the customers were[,]" and there were hundreds of them. (Tilton Depo. at 47.) No additional consideration was offered to Dr. Kitos to sign the agreement. Dr. Kitos did not like the language of the agreement and felt he already had a contract with the company. The meeting ended when Dr. Kitos indicated he would not sign the agreement. Tilton "probably indicated that's not good[,]" and informed Tammy Owens about the meeting. (Id. at 42-45.) In the last meeting of Tilton and Dr. Kitos about the agreement, Dr. Kitos indicated to Tilton that he would consider signing the non-solicitation/confidentiality agreement if changes were made to it. (Id. at 45.) The record does not indicate any attempts were made to revise the language of the agreement to Dr. Kitos' liking.

On March 8, 2006, Dr. Kitos submitted his resignation, effective May 15, 2006. (Id. at 97; Depo. Ex. 12.) He submitted his resignation on March 8 to give the company notice that he did not

---

[2]It appears that Dr. Kitos also was due to receive at least some portion of his $22,882.24 target bonus for 2005.

intend to remain employed beyond the original one-year period he had agreed to remain employed pursuant to his letter agreement and to give the company time to hire and train his replacement. (Id.) Dr. Kitos also knew that the profit-sharing policy specified May 15 as the outside date for employment in order to receive a target bonus. (Id. at 104.)

On March 9, 2006, Dr. Kitos met with Owens and Tilton in Owens' office. Because Dr. Kitos asked to stay at Esoterix until May 15, 2006, Owens explained that Dr. Kitos would still have to sign the non-solicitation/confidentiality agreement. Tilton recalled that he and Owens made a "last-ditch effort" to convince Dr. Kitos to sign the agreement. (Docket Entry No. 56-7, Tilton Depo. at 62.) Dr. Kitos stated he did not agree with the language in the non-solicitation/confidentiality agreement and he had a contract to remain employed for one year. He suggested further negotiations about the matter. Tilton responded that every employee, including himself, was required to sign the agreement. Dr. Kitos indicated he was not going to sign the agreement. Owens reiterated that signing the agreement was a condition of employment and because Dr. Kitos would not sign it, his employment was terminated. She did not accept Dr. Kitos' resignation. (Kitos Depo. at 96; Owens Depo. at 60; Tilton Depo. at 63.)

Dr. Kitos felt his firing was without cause and was unjustified. (Kitos Depo. at 33.) He felt he had an agreement with the company to remain employed for one year and the company tried to change the agreement in midstream. Dr. Kitos was not sure when he presented his resignation letter that his employment would be terminated for failure to sign the non-solicitation/confidentiality agreement. He testified: "It had been pushed back once before when I said I expected them to honor it [apparently his stay-on agreement]. It happened in January so I was – did not know for a fact whether or not pushing back again, that there would be a reconsideration." (Kitos Depo. at 103.)

Dr. Stelzer met with Dr. Weiss on Friday, March 3, 2006. In light of the 2005 target bonus potentially to be paid shortly and the retention bonus to be paid in approximately two months, Dr. Stelzer encouraged Dr. Weiss to sign the non-solicitation/confidentiality agreement. Dr. Stelzer conveyed to Dr. Weiss that failure to sign the agreement was grounds for termination. Dr. Weiss was leaving on a long weekend and agreed to think about it. (Id. at 25-27.) According to Dr. Weiss, Dr. Stelzer told him he could be terminated for cause and he would not receive his 2005 target bonus if he did not sign the non-solicitation/confidentiality agreement. (Weiss Depo. at 22-24.) Dr. Stelzer remembered the conversation somewhat differently, testifying that he told Dr. Weiss his employment would be terminated if he did not sign the non-solicitation/confidentiality agreement, and if he were terminated, he would not be employed on the bonus payment date; consequently, he would not receive his target bonus. (Stelzer Depo. at 32-33.)

Dr. Weiss did not believe LabCorp wanted him to resign; however, he felt he was forced to resign because he either had to sign the non-solicitation/confidentiality agreement or face termination, and he did not want a termination on his employment record. (Weiss Depo. at 23-24, 29.) Dr. Weiss knew that if he signed the non-solicitation/confidentiality agreement, he would be prohibited from soliciting LabCorp customers and employees for one year. In a letter dated Tuesday, March 7, 2006, Dr. Weiss resigned his employment, effective immediately. He presented the letter to Dr. Stelzer on Wednesday, March 8, 2006. (Id. at 28.)

Upon receiving the resignation letter, Dr. Stelzer exclaimed, "What, are you insane?" (Stelzer Depo. at 35.) Dr. Stelzer reminded Dr. Weiss again that he needed to stay only two more months and he would receive a substantial retention bonus. Dr. Stelzer chided Dr. Weiss that he was leaving "free" money on the table. Even if Dr. Weiss wanted to leave and do something else,

11

Dr. Stelzer thought it made sense for Dr. Weiss to wait until June. Dr. Stelzer also told Dr. Weiss he did not want him to leave Esoterix. Dr. Stelzer knew LabCorp's allergy business was in turmoil, he had been told that Dr. Weiss had more knowledge and stronger management skills and style than anybody else in the business, and Dr. Weiss was being looked up to by the LabCorp science and management group to be the "champion" for the allergy business. Dr. Stelzer told Dr. Weiss, "You could be the guy, man." Dr. Weiss responded that there were things he wanted to do in his life and "this would be a good opportunity to do it." (Id. at 28.) Dr. Stelzer knew, based on all the information he had at the time, that LabCorp would terminate Dr. Weiss's employment, likely by the end of that week, if Dr. Weiss did not sign the non-solicitation/confidentiality agreement. (Id. at 36.)

Dr. Stelzer did not know why Esoterix employees were not asked to sign the LabCorp non-solicitation/confidentiality agreement immediately upon LabCorp's acquisition of Esoterix. (Id. at 38.) Esoterix had a very similar requirement that employees sign nonsolicitation/confidentiality agreements, and Dr. Stelzer thought "that everybody who was working, to [his] knowledge, had signed." (Id. at 38-39.) Dr. Stelzer viewed the non-solicitation/confidentiality agreement as standard business practice, and he assumed that Dr. Weiss had signed such an agreement for Esoterix, just as Dr. Stelzer and other Esoterix employees had done. (Id. at 40.) Dr. Stelzer could think of no reason why Dr. Weiss would not want to stay and take the bonus money that was coming to him unless his intent was to start a business and solicit LabCorp's customers. (Id. at 40-41.)

Dr. Weiss testified that one of the reasons he resigned immediately was because LabCorp was not going to pay him the 2005 target bonus he had already earned. (Weiss Depo. at 89.) According to Dr. Weiss, his resignation was not accepted until March 9, 2006, after Dr. Stelzer

checked on the status of the 2005 target bonuses.  (Id.; Docket Entry No. 53-5, Separation Memorandum.)  Defendants dispute that the date Dr. Weiss's resignation was accepted was determined by the date 2005 target bonuses were mailed.

LabCorp paid the 2005 target bonuses to eligible employees, not including Dr. Weiss and Dr. Kitos, on March 10, 2006.  (Docket Entry No. 53-7 ¶ 10.)  Dr. Stelzer felt it was "strictly coincidental" that employees were asked to sign the non-solicitation/confidentiality agreement during the same period when the 2005 target bonuses were at issue.  (Stelzer Depo. at 41.)  LabCorp did not pay Dr. Kitos or Dr. Weiss severance, 2005 target bonuses, or retention bonuses.

According to Ms. Owens, Esoterix revised its target bonus program effective February 1, 2004, and Esoterix's Policy No. 183, entitled "Profit Sharing Program for 2004," was in effect in 2005 and governed bonuses paid in 2006 for company performance during the 2005 calendar year.  (Docket Entry No. 49-2, Owens Aff. ¶ 5.)  Esoterix's 2004 bonus plan stated: "Employees who are not employed by the Company on the Profit Sharing Eligibility Date, either because of their resignation or termination (other than lay-off), will not receive a payment even if they have met all other requirements and conditions for a payment."  (Docket Entry No. 49-8 at 35.)  According to Dr. Stelzer, the bonus program was not necessarily active every year and there was no guarantee that employees would receive a bonus.  (Docket Entry No. 49-3, Stelzer Aff. ¶¶ 5-6.)

Dr. Kitos and Dr. Weiss contend that Defendants did not produce Esoterix's 2005 target bonus plan during discovery, and the only plan Defendants produced was for the 2004 year.  They further contend that they were not required to be employed at Esoterix on the day the 2005 target bonuses were paid in order to receive the bonuses they had earned.  It is undisputed that Dr. Kitos

13

and Dr. Weiss were not working at Esoterix on March 10, 2006, the day the target bonuses were paid for 2005.

Allermetrix Inc. was incorporated in Tennessee on March 14, 2006. The Allermetrix corporate charter was filed with the Secretary of State on March 21, 2006. Most of the work in putting the company together, including purchasing necessary equipment, began in April 2006. (Kitos Depo. at 171.) Allermetrix officially opened for business in August 2006 and, according to Dr. Weiss, solicited LabCorp customers. (Weiss Depo. at 111; Kitos Depo. at 191.) Dr. Kitos testified that Allermetrix may have done work for LabCorp customers or former customers, but without a client list he had no way of knowing for sure. (Kitos Depo. at 191-192.)

Defendants have not alleged that Dr.Kitos and Dr. Weiss solicited LabCorp customers before the end of their employment with LabCorp in March 2006. Defendants also have not alleged that Dr. Kitos or Dr. Weiss used any confidential or proprietary information of the Defendants at Allermetrix.

Cecilio Olavarria testified that he was considering leaving his employment at Esoterix even before he knew that Plaintiffs were thinking about opening their own laboratory. Olavarria did not have a letter agreement for continued employment like Dr. Kitos and Dr. Weiss. He resigned from his employment at Esoterix in March 2006 after he was told he would be fired if he did not sign a LabCorp non-solicitation/confidentiality agreement. Olavarria began working at Allermetrix in August 2006, but he is no longer employed there and now works for U.S. Labs, a subsidiary of LabCorp.

Dr. Weiss claims in his complaint that Defendants materially breached his letter agreement of April 21, 2005 by: (1) insisting that he sign a non-competition agreement that was not

14

contemplated by the parties at the time the letter agreement was executed and requiring that he sign the non-competition agreement without payment of additional consideration; (2) deliberately creating conditions intolerable to him to force him to resign, effectively causing termination by constructive discharge; (3) refusing to pay him severance of $76,292.84; and (4) refusing to pay him the target bonus of $19,902.48 he earned for 2005. Dr. Weiss further claims that Defendants acted maliciously and in willful, reckless and wanton disregard of his rights. He seeks a total of $96,195.32 in damages, with prejudgment interest from the date the losses were sustained, plus punitive damages and costs. Defendants brought four counterclaims against Dr. Weiss, including breach of fiduciary duty, breach of duty of loyalty, tortious interference with business relations, and constructive trust. Defendants seek damages, punitive damages, costs and attorney's fees.

Dr. Kitos claims in his complaint that Defendants materially breached his letter agreement of April 22, 2005 by: (1) terminating his employment without cause in March 2006; (2) refusing to pay him severance in the amount of $87,918.59; and (3) refusing to pay him the target bonus of $22,882.24 he earned for 2005. Dr. Kitos further claims that Defendants acted maliciously and in willful, reckless and wanton disregard of his rights. He seeks a total of $110,800.83 in damages, with prejudgment interest from the date the losses were sustained, plus punitive damages and costs. Defendants brought four counterclaims against Dr. Kitos, including breach of fiduciary duty, breach of duty of loyalty, tortious interference with business relations, and constructive trust. Defendants seek damages, punitive damages, costs and attorney's fees.

## II.  STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See

15

Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. <u>Celotex</u>, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

### III. <u>ANALYSIS</u>

**A. Plaintiffs' Claims**

The letter agreements signed by Dr. Kitos and Dr. Weiss contain choice of law provisions providing that North Carolina law applies to the terms of the agreements. Under North Carolina law, the elements of a claim for breach of contract are: (1) existence of a valid contract and (2) breach of the terms of that contract. <u>Parker v. Glosson</u>, 641 S.E.2d 735, 737 (N.C. Ct. App. 2007).

16

In construing a contract, the Court must ascertain the intention of the parties as of the time the contract was made and to do this, "consideration must be given to the purpose to be accomplished, the subject matter of the contract, and the situation of the parties." <u>Bald Head Island Utilities, Inc.</u> <u>v. Village of Bald Head Island</u>, 599 S.E.2d 98, 100 (N.C. Ct. App. 2004). The Court must discern the intention of the parties from examining the entire instrument, and an excerpt from the contract must be interpreted in context with the rest of the agreement. <u>Id.</u> When the language of a contract is clear and unambiguous, the Court must give effect to its terms and, under the guise of construction, the Court "cannot reject what the parties inserted or insert what the parties elected to omit." <u>Id.</u> The matter of contract interpretation is a question of law for the Court. <u>Alchemy</u> <u>Communications Corp. v. Preston Dev. Co.</u>, 558 S.E.2d 231, 233 (N.C. Ct. App. 2002).

It is undisputed that at the time Dr. Kitos and Dr. Weiss signed the letter agreements in April 2005, no one explicitly informed them that they would be required to sign nonsolicitation/confidentiality agreements with LabCorp as a condition of continued employment. Nonetheless, the letter agreements Dr. Kitos and Dr. Weiss signed provided in mandatory language: "<u>Terms and Conditions.</u>  You shall be subject to and shall comply with all Company policies and procedures as they may be amended and/or supplemented from time to time."  Further, the letter agreements provided:

> <u>Pre-Conditions.</u>  This offer of continued employment on these terms, and in particular your eligibility for a Severance Payment and a Retention Bonus, is expressly contingent on the following: . . . (2) your complying with all LabCorp policies and related agreements.

Thus, by the contracts' plain terms, Dr. Kitos and Dr. Weiss knew that they were subject to "all Company policies and procedures as they may be amended and/or supplemented from time to time."  By signing the letter agreements they agreed to comply with ***all*** "LabCorp policies <u>and</u>

17

related agreements" as a precondition to (a) continued employment and (b) their eligibility for severance payments and retention bonuses. Additionally, the letter agreements contemplated that Dr. Kitos and Dr. Weiss may then have been subject to Esoterix nonsolicitation/confidentiality agreements and that such agreements, if in force, would not be superseded by the letter agreement.

The Court concludes that the intention of the parties in making the letter agreements was clear: Dr. Kitos and Dr. Weiss agreed to abide by all Esoterix and LabCorp policies and procedures, including related agreements, in return for the assurance of continued employment by Esoterix/LabCorp for a period of one year with the same salary, title, and target bonus, as well as assurance of the payment of six months' severance and six months' target bonus in the event their employment was terminated without cause prior to the one-year anniversary date of LabCorp's acquisition of Esoterix. If Dr. Kitos and Dr. Weiss had any questions about the meaning of the language in the letter agreements requiring them to comply with all "LabCorp policies and related agreements," the time to obtain clarification was prior to signing the letter agreements. Plaintiffs contend they did not have access to LabCorp policies and procedures in April 2005 to learn what was meant by "LabCorp policies and related agreements." But even taking that as true, Plaintiffs produce no evidence that Esoterix or LabCorp somehow precluded them from finding out what was meant by "LabCorp policies and related agreements." Apparently without asking any questions, Dr. Kitos and Dr. Weiss executed the letter agreements, and in doing so they contractually bound themselves to comply with all LabCorp policies and related agreements.[3] The Court must interpret

---

[3]Plaintiffs also contend that there was no mutual agreement to make valid contracts, but if that is so, then no contracts were ever reached and Defendants are under no binding obligation to pay Plaintiffs any amount for severance or bonuses. See Routh v. Snap-On Tools Corp., 423 S.E.2d 791, 795 (N.C. Ct. App. 1992).

the letter agreements as they exist; the Court may not rewrite the bargain the parties made of their own accord. See Bald Head Island Utilities, Inc., 599 S.E.2d at 100.

Any doubts Dr. Kitos and Dr. Weiss may have had about LabCorp's policies were dispelled in September 2005, approximately three months after LabCorp's purchase of Esoterix closed in May 2005. In September Dr. Kitos and Dr. Weiss obtained intranet access to LabCorp's policies and procedures. LabCorp's policy on Confidentiality & Security, Policy Number 2-202 (Docket Entry No. 53-9), placed Dr. Kitos and Dr. Weiss on notice that "the Company requires that all employees sign confidentiality and non-solicitation agreements, which they must observe. Employees found to be in violation of the above policies will be subject to corrective action." (Id.)

Thereafter, with knowledge of LabCorp's policy on nonsolicitation/confidentiality agreements, Dr. Kitos and Dr. Weiss in late 2005 and early 2006 took preparatory steps to open their own laboratory. The evidentiary record leaves no doubt that Dr. Kitos and Dr. Weiss intended to compete directly with LabCorp and that they intended to solicit LabCorp customers. Yet, when LabCorp requested in early 2006 that Dr. Kitos and Dr. Weiss sign nonsolicitation/confidentiality agreements, Dr. Kitos and Dr. Weiss refused on the ground that they already had contracts which did not expressly require them to sign nonsolicitation/confidentiality agreements.

When Dr. Kitos refused to sign the nonsolicitation/confidentiality agreement required by LabCorp policy, LabCorp terminated his employment. The Court concludes that, under the letter agreement Dr. Kitos signed, the termination of his employment was "for cause." The letter agreement explicitly defined "cause" as "any violation by you of the Company's or LabCorp's policies[.]" Dr. Kitos violated LabCorp's Confidentiality & Security policy when he refused to sign

19

a nonsolicitation/confidentiality agreement.[4] Because Dr. Kitos' employment was terminated for cause, he was not entitled to the payment of a retention bonus or severance under the terms of the letter agreement.

Dr. Weiss resigned his employment, but contends that he was constructively discharged without cause. The evidence tends to show that LabCorp and Esoterix did not make working conditions intolerable and that Dr. Weiss voluntarily resigned his employment. But progressing past any potential factual dispute to assume that Dr. Weiss was constructively discharged, his discharge from employment was "for cause," just as Dr. Kitos' discharge was "for cause." Dr. Weiss violated LabCorp policy by refusing to sign a nonsolicitation/confidentiality agreement after he signed the letter agreement and expressly agreed to abide by LabCorp policies and related agreements.

---

[4]The issue is not whether LabCorp tried to coerce Plaintiffs to sign unenforceable nonsolicitation/confidentiality agreements, but whether LabCorp had "cause" to terminate Plaintiffs' employment for violation of LabCorp policy. In any event, Plaintiffs did not sign nonsolicitation/confidentiality agreements. Moreover, the nonsolicitation/confidentiality agreements appear to be enforceable because they were reasonably limited in time to 12 months and also reasonably limited in territory with regard to the solicitation of LabCorp customers. See Farr Assoc., Inc. v. Baskin, 530 S.E.2d 878 (N.C. Ct. App. 2000) (recognizing validity of geographic restrictions that are limited by client, not area); Hartmann v. W.H. Odell and Assocs., Inc., 450 S.E.2d 912, 916 (N.C. Ct. App. 1994) (whether geographic scope is reasonable is determined by six factors: (1) area or scope of restriction; (2) area assigned to employee; (3) area where employee actually worked; (4) area in which employer operated; (5) nature of business involved; and (6) nature of employee's duty and his knowledge of the employer's business operation). The proposed agreements precluded Dr. Kitos and Dr. Weiss from directly or indirectly soliciting:

> the medical laboratory testing needs of any customer of LabCorp (i) to which you were assigned or for which you were responsible; (ii) of which you had knowledge, directly or indirectly, or (iii) to whose names you had direct or indirect access, through LabCorp's computer systems or otherwise, during your employment with LabCorp.

(Docket Entry No. 53-3 at 1.)

20

Because Dr. Weiss' employment ended "for cause," he was not entitled to the payment of a retention bonus or severance under the terms of the letter agreement.

Both Plaintiffs contend that LabCorp did not offer them any additional consideration to sign the nonsolicitation/confidentiality agreements. LabCorp was not required to offer additional consideration for the nonsolicitation/confidentiality agreements because the consideration LabCorp gave earlier–continued employment for one year with the new entity LabCorp after the acquisition of Esoterix along with potential retention bonuses–supported all of the terms of the letter agreements which Plaintiffs executed, including their express agreement to abide by all LabCorp policies and related agreements. The nonsolicitation/confidentiality agreement effectively became part of the employment contract and was supported by adequate consideration from LabCorp. See Farr, 530 S.E.2d at 881 (promise of new employment is valuable consideration in support of covenant not to compete).

As to 2005 target bonuses, Dr. Kitos and Dr. Weiss agreed to abide by Esoterix policies as well as LabCorp policies when they signed the letter agreements. The letter agreements stated: "You shall be subject to and shall comply with all Company policies and procedures as they may be amended and/or supplemented from time to time." Further, the letter agreement defined "cause" as "any violation by you of the Company's or LabCorp's policies." The words "Company" and "LabCorp" in the same sentence, separated by the disjunctive "or," obviously referred to two separate entities. "Company" clearly meant Esoterix, as the letter agreements were presented by Esoterix on Esoterix letterhead and were signed by an Esoterix executive. The reference to "LabCorp" could only mean "LabCorp," the purchaser of Esoterix. These clauses in the letter

agreements, when read harmoniously, confirm that Dr. Kitos and Dr. Weiss were subject to both Esoterix policies and LabCorp policies.

Esoterix policy required an employee to be employed on the day target bonuses were paid.[5] Dr. Stelzer testified that Esoterix employees did not meet the performance targets set in 2005 and as a result, 2005 target bonuses were not due to be paid in 2006. Even so, Esoterix's CEO lobbied LabCorp management in an effort to convince LabCorp to pay some portion of 2005 target bonuses anyway. Dr. Stelzer testified he did not know if or when 2005 target bonuses would be paid, and Plaintiffs did not produce any evidence to contradict Dr. Stelzer's testimony to show that Esoterix employees were entitled to 2005 target bonuses as a matter of right. LabCorp paid 2005 target bonuses on March 10, 2006. Dr. Kitos and Dr. Weiss were not employed on that date and, under applicable Esoterix policy, to which they agreed to be bound in the letter agreements, they were not eligible to receive 2005 target bonuses.[6] See Underwood v. MacMillan/McGraw-Hill School Publishing Co., 1996 WL 31139 at *2 (Tenn. Ct. App. 1996) (enforcing employer's written plan stating date on which employee must be employed to receive bonus); Weir v. Golden Circle Ford, 1988 WL 25277 at *4 (Tenn. Ct. App. 1988) (enforcing employer's written policy that employee must be employed at year's end to receive sales bonus); Stangenberg v. Allied Distrib. & Bldg. Serv. Co., 1986 WL 7618 at *6 (citing Kassab v. Ragnar Benson, Inc., 254 F.Supp. 830, 833 (W.D. Penn. 1966) and O'Madigan v. General Motors Corp., 202 F.Supp. 190, 193 (E.D. Mo. 1961), aff'd, 312

---

[5]Plaintiffs contend that the Esoterix target bonus policy produced by Defendants in discovery applied to the 2004 calendar year and not 2005. Tammy Owens attests, however, that the same Esoterix policy in effect in 2004 was also in effect in 2005. Plaintiffs did not produce any evidence to contradict Owens' attestation. They merely argue that Defendants failed to produce a 2005 policy in discovery. Plaintiffs have not carried their evidentiary burden to oppose the Defendants' summary judgment motions on this point.

[6]Esoterix's policies are a matter of Tennessee law.

Case 3:06-cv-00950   Document 82   Filed 12/11/07   Page 22 of 25 PageID #: 923

F.2d 250 (8th Cir. 1963)).  Even assuming that Dr. Kitos and Dr. Weiss were promised target bonuses in their letter agreements, their employment ended "for cause" and Dr. Kitos and Dr. Weiss were not entitled to target bonuses under the letter agreements.

Accordingly, the Court concludes that Defendants' motions for summary judgment on Plaintiffs' breach of contract claims will be granted, and Plaintiffs' cross-motions for summary judgment on the breach of contract claims will be denied.

## B. Defendants' Counterclaims

Plaintiffs assert that only officers and directors of a corporation owe a fiduciary duty to the corporation and its members, Efird v. Clinic of Plastic and Reconstructive Surgery, P.A., 147 S.W.3d 208, 221 (Tenn. Ct. App. 2004), and since they did not serve as officers or directors, they did not owe any fiduciary duty to Esoterix or LabCorp.  There does not appear to be any dispute that Dr. Kitos and Dr. Weiss did not serve as executive officers or directors of Esoterix or LabCorp. Therefore, Plaintiffs are entitled to summary judgment on Defendants' claim of breach of fiduciary duty.

Defendants further claim that Plaintiffs, as employees, breached their duty of loyalty.  See id. at 219.  Defendants allege that Plaintiffs did not act solely for the benefit of their employer in matters within the scope of their employment.  See Knott's Wholesale Foods, Inc. v. Azbell, 1996 WL 697943 at *3 (Tenn. Ct. App. Dec. 6, 1996).

An employee may make arrangements or prepare to compete with his employer prior to termination from or resignation of employment, including purchasing a rival business, but he may not use confidential information peculiar to his employer's business and acquired in conjunction with the employer's business.  Venture Express, Inc. v. Zilly, 973 S.W.2d 602, 606 n.2 (Tenn. Ct.

App. 1998); Party Lite Gifts, Inc. v. Swiss Colony Occasions, 2006 WL 2370338 at *7 (E.D. Tenn. Aug. 15, 2006).  An employee may even go so far as to file a corporate charter for a new competing company, see Zilly, 973 S.W.2d at 606 n.2, but here, Plaintiffs did not file the corporate charter for Allermetrix until their employment with LabCorp ended.  An employee cannot solicit customers for his business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.  Knott's Wholesale Foods, Inc., 1996 WL 697943 at *4. Here, Defendants have made no allegation that Plaintiffs solicited LabCorp or Esoterix customers before their employment ended.

Defendants claim that Dr. Kitos and Dr. Weiss used their company computers to communicate by email about their new laboratory and they recruited Cecilio Olivarria to leave Esoterix to work for them at Allermetrix.  In their Supplemental Brief, LabCorp and Esoterix assert that Dr. Kitos and Dr. Weiss breached the duty of loyalty by disclosing confidential and proprietary LabCorp information through their Allermetrix Business Plan submitted to banks to obtain financing for the new, competing laboratory; by suggesting in the Business Plan the possibility that Plaintiffs may have misappropriated Defendants' proprietary robotic and LIS systems; and prominently representing in the Business Plan that a LabCorp employee, Olivarria, would serve as Allermetrix's Director of Sales, raising questions about the timing of Plaintiffs' solicitation of Olivarria as an Allermetrix employee.

In response, Dr. Weiss attests that he obtained information about the cost of manufacturing allergy tests, which he included in the Allermetrix Business Plan at page 11, long before he went to work for Esoterix in 2000.  (Weiss Aff. at ¶ 2.)  He further avers that Allermetrix does not use a robotics system or the LIS software system used by LabCorp.  (Id. ¶¶ 3-4.)  As to the hiring of

Olivarria, Plaintiffs state in their supplemental brief that they "have never disputed that Dr. Kitos spoke with Mr. Olavarria about their potential new business before the Plaintiffs were discharged." (Docket Entry No. 80, Supp. Br. at 4.)  Plaintiffs argue that the

> only significance to Mr. Olivarria's name appearing in the business plan is that by the time the plan was drafted, he already must have made his decision to leave LabCorp because of the uncertainty of his job status after the acquisition and he had already told the Plaintiffs that he wanted to come to work for them if their plans came to fruition.  (Olavarria Depo. at p. 14, l.23 - p. 18, l. 6).  What the Plaintiffs do not know is whether the Defendants' threat to fire Mr. Olavarria for not signing a Non Solicitation/Confidentiality Agreement had occurred by that point.  (Olavarria Depo. at p. 20, l. 11-20).

(Id. at 4-5.

The materials that LabCorp, Esoterix, and the Plaintiffs submitted with their Supplemental Briefs generate genuine issues of material fact for trial on the breach of loyalty, tortious interference with business relations, and constructive trust counterclaims.  Accordingly, the Court will deny Plaintiffs' motions for summary judgment on all counterclaims except breach of fiduciary duty.

## IV.  CONCLUSION

For all of the reasons stated, Defendants' Motions for Summary Judgment on Plaintiffs' breach of contract claims (Docket Entry Nos. 49 & 56) will be granted.  Plaintiffs' Motions for Summary Judgment will be denied as to Plaintiffs' claims, but granted in part and denied in part as to Defendants' counterclaims.  Defendants' counterclaim for breach of fiduciary duty will be dismissed.  Defendants' counterclaims for breach of duty of loyalty, tortious interference with business relations, and constructive trust will remain for trial.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE